**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

**Dennis Mounce**

   **v.**                              Civil No. 10-cv-560-PB
                                      Opinion No. 2011 DNH 181
**Michael J. Astrue, Commissioner,**
**Social Security Administration**

**MEMORANDUM AND ORDER**

Dennis Mounce seeks judicial review of a decision by the Commissioner of the Social Security Administration denying his application for disability insurance and supplemental security income benefits. Because the Administrative Law Judge who considered Mounce's application failed to properly assess his pain complaints, I reverse the Commissioner's decision and remand the case for further proceedings consistent with this Memorandum and Order.

## I.  BACKGROUND[1]

### A. Procedural History

_____

[1] Except where otherwise noted, the background information is drawn from the parties' Joint Statement of Material Facts (Doc. No. 11).  See LR 9.1(b).  I cite to the administrative record with the notation "Tr."

On April 12, 1996, Dennis Mounce was approved for disability insurance benefits ("DIB").  He returned to work in March 1998, and again applied for DIB in 2007.  That application was denied on June 29, 2007.  On June 16, 2008, he applied for both DIB and Supplemental Security Income ("SSI") benefits, and was denied.  He requested an administrative hearing, and on July 6, 2010, Administrative Law Judge ("ALJ") Thomas Merrill issued a decision finding Mounce not disabled.  The ALJ found that he retained the residual function capacity ("RFC") to perform work existing in significant numbers in the national economy.  The Decision Review Board affirmed the ALJ's decision on October 7, 2010.

B.  **Personal Information**

Mounce was 50 years old as of the date of his administrative hearing.  He completed the 8th grade, and later obtained a GED.  His past relevant work included work as a carpenter, restoration worker, catastrophe adjuster, and property adjuster.  He alleges that the onset date of his disability was January 7, 2004.

C.  **Medical Evidence**

On December 27, 1994, Mounce informed Dr. Clifford Levy of Concord Orthopaedics that he had injured his left shoulder. He was treated with anti-inflammatory medication and physical therapy. His injury did not improve. On February 6, 1995, Mounce complained to Dr. Levy of significant neck pain going towards both shoulders. X-rays revealed moderate cervical spondylosis and an MRI scan showed a central disk herniation at C5-6.

On March 30, 1995, Dr. Douglas Moran performed surgery to repair Mounce's left shoulder. On May 24, 1995, Mounce reported that he was still having neck pain, and Dr. Moran again noted his diagnosis of cervical spondylosis with disk herniation at C5-6. In July 1995, Dr. Moran stated that Mounce's shoulder was not going to feel better unless he could improve his range of motion. On August 21, 1995, Dr. Moran allowed Mounce to return to some work involving lifting of no more than 5 pounds. Dr. Moran noted that Mounce's neck was still causing problems.

In March 1996, Dr. Levy recommended an anterior cervical discectomy with allograft upon review of X-rays showing degenerative changes and disk herniation at C5-6. The procedure was performed on April 4, 1996. In July 1996, Dr. Moran

maintained his light duty recommendation with regard to Mounce's left arm, and found an impingement type tendency that affected his right shoulder.  In November 1996, Dr. Moran found impingement, bursitis, and rotator cuff tendinitis in his right shoulder, and called the injury an overuse syndrome.  In March 1997, Dr. Moran noted that Mounce had some impingement bursitis and rotator cuff tendinitis in his right shoulder.  He classified the condition as a probable bilateral shoulder pathology with probable subacromial scarring and a possible residual AC tear in Mounce's left shoulder and impingement and rotator cuff tendinitis in the right shoulder.  By July 1997, Dr. Moran responded to Mounce's complaints of sore shoulders and hands by stating that his right shoulder probably had a labral tear and subacromial pain.

On August 13, 1997, Mounce underwent surgery for his right shoulder.  That December, he returned to Dr. Levy complaining of increasing symptoms in his neck.  By May 1998, Dr. Moran noted that Mounce had AC joint and rotator cuff pain.  Dr. Moran determined that intervention was unnecessary, although described the pains as real symptoms.  In November 1999, Mounce complained to Dr. Moran that his left shoulder felt like it had before

4

surgery. X-rays showed a well-seated AC joint, a slight clavicular overgrowth and a flat acromin. Dr. Moran stated that Mounce would have occasional shoulder pain and should continue his exercises, but that further surgery was not appropriate.

Nearly six years later, on May 16, 2003, Mounce returned to Concord Orthopaedics complaining of neck pain. On examination, Andrew Scala, PA, observed that Mounce had pain predominantly in the left side of his neck and had a tender left upper trapezius. At a visit one month later, Mounce had improved.

On January 8, 2004, Mounce went to the emergency room complaining of an injury to his right knee that occurred while driving a snowmobile. He was diagnosed with a right knee sprain.

On January 16, 2004, Dr. Moran saw Mounce about his new knee problem. At that time, Mounce was not taking medication for the knee. In light of his observations, the doctor thought the injury was a medial meniscal tear. A right knee MRI, performed on January 22, 2004, revealed moderate-sized joint effusion, and a subtle radial tear of the posterior horn of the medial meniscus.

At his next appointment with Dr. Moran, on February 6, 2004, Mounce was limping terribly, and the doctor advised him to have knee surgery.  On February 13, 2004, Mounce underwent right knee surgery.  One month later, Mounce advised Dr. Moran that he was very happy to have weaned himself off his crutches and that he felt pretty good.  Dr. Moran noted that Mounce "is doing spectacularly well, but it's early."  Tr. at 274.  The doctor observed that he was not in acute distress, he was neurovascularly intact, his hip and thigh were nontender, his flip test and straight leg raising were negative, and he had full extension to 130 degrees of flexion.  Dr. Moran informed him that although the microfracture technique did well at preserving the joint, it would not cure the significant arthritis in his knee.  Dr. Moran advised Mounce not to walk for exercise, but told him that he should bike or swim and that he could engage in resistive strength workouts.  Dr. Moran concluded that there was "a lo[t] to accomplish here but we're off to a very good start."  Mounce next saw Dr. Moran on May 24, 2004, and described his condition as fair.

The next instance of relevant treatment that is uncontested by the parties occurred on February 21, 2008, when Mounce went

6

to see Dr. Anthony Marino about his knee pain.[2]  Dr. Marino noted that he had shown improvement a year or two ago with Synvisc injections.  Dr. Marino also noted that Mounce was significantly overweight and had a varus alignment of his knees with classic degenerative alignment.  X-rays showed medial compartment arthritis with spurring and patella femoral arthritis.  Dr. Marino diagnosed Mounce with bilateral knee arthritis.

On Febrary 26, 2008, Mounce had a routine physical exam. Christopher Schwieger, PA, noted that Mounce had a history of osteoarthritis, left and right shoulder surgery, C5-6 fusion, intermittent anxiety, fatigue, obesity, and chronic knee pain. Schwieger also noted Mounce's current course of Synvisc injections.

On March 4, 2008, Schwieger noted that Mounce would be receiving weekly bilateral knee Synvisc injections over the next three weeks.  Mounce returned for those injections on March 6, 14, and 21.  By March 31, Mounce's pain and discomfort had not improved, and he received bilateral Euflexxa injections.

---

[2] Whether Mounce received treatment between May 2004 and February 2008, and whether such treatment is part of the record, are subjects of contention between the parties.

On June 25, 2008, Mounce returned to Concord Orthopaedics complaining of neck pain and weakness in his arms and hands that he stated had been chronic since his surgery.  X-rays revealed degenerative disk changes with moderate osteophyte formation at the C6-7 level, and Mounce was diagnosed with C6-7 degenerative disk disease.

A July 7, 2008 MRI showed a new small right paracentral disk protrusion indenting the right cord at C4-5 which was mildly stenotic to a broad disk bulge.  The MRI showed uncovertebral hypertrophy without significant neural foraminal narrowing, fusion at C5-6, and a minimal disk bulge at C6-7.

Two days later, Mounce complained to Dr. Levy that he felt limited and was unable to do much of anything due to the pain in his neck, shoulders, and knees.  X-rays revealed degenerative changes at C6-7 and Dr. Levy found that Mounce had a limited range of motion, but was not tender.  Dr. Levy also noted that Mounce felt he did not have the financial means to pursue treatment.

On July 25, 2008, Mounce saw Dr. Moran for his shoulder pain and weakness.  Mounce told the doctor that overall, his shoulders were weak compared to their state prior to 2003.  He

also reported that his shoulder had improved after surgery and that the improvement persisted for more than 10 years until he sustained the cervical injury.  Although he underwent physical therapy following the surgical procedures and felt the shoulders were doing quite well, he stated that he was unable to do anything without discomfort.  After conducting a number of tests, Dr. Moran's impression was that Mounce had bilateral shoulder mild impingement with rotator cuff weakness.  Dr. Moran recommended physical therapy, but Mounce was unsure whether he was financially able to pursue that option.

On September 8, 2008, Mounce followed up on his shoulder pain and weakness with Dr. Moran and his physician's assistant, Nina Joe.  They recommended physical therapy, but Mounce explained that he could not pursue physical therapy until he resolved his Workers' Compensation claims.  Mounce's shoulders felt similar to the way they had previously, though a bit achier.  After examination, his treatment providers declared that he had bilateral shoulder impingement with rotator cuff weakness.  They again recommended physical therapy and increased use of ice and anti-inflammatories.

Mr. Scala had referred Mounce for a Functional Capacity Evaluation, which Mounce attended on September 17, 2008.  The physical therapist, Rachel Heath, noted that testing and observation suggested the presence of submaximal effort, by which she did not mean to make implications about his intent, but rather meant to indicate that Mounce could, at times, physically do more than he demonstrated during the day of testing.  She concluded that Mounce's ability to resume full-time work was poor to fair, noting that he exhibited psychophysical limitations.  She found that he demonstrated an ability to function 4 hours per day, 5 days per week, at a light capacity at a job that accommodated his need for positional changes every 15-30 minutes.  She further concluded that, based on a 4-hour day, he could frequently sit, reach, and engage in fine motor activities; he could occasionally bend, kneel, squat, climb, stand, and walk; and he could lift/carry a maximum of 20 pounds occasionally and 10 pounds frequently.

Mounce returned to Dr. Moran on September 30, 2008, for his right knee.  Although Synvisc had worked well in the past, Euflexxa was not effective and he was experiencing severe pain.  X-rays revealed a considerable loss of joint space in the medial

joint line of the patella femoral joint.  Mounce's knee was
injected with a combination of Lidocaine, Marcaine, and Depo-
Medrol, which Dr. Moran believed would help in the short term.
Dr. Moran noted that nothing surgical would make Mounce's knee
feel better in the long term because surgery, although it could
cure his meniscal tear, could not cure his arthritis.  Dr. Moran
concluded that Mounce had to lose weight.  The doctor noted that
doing so would be challenging because he could not "exercise a
lot on that knee," but when Mounce felt better, some exercises
would be incorporated.

On October 10, 2008, Mounce saw Dr. David Nagel for a
translaminar epidural to address his neck pain.  The doctor
noted that Mounce's neck had been bothering him since 2003, with
pain similar to what he experienced prior to the operation.

On October 14, 2008, Mr. Scala completed a Medical Source
Statement of Ability to do Work-Related Activities.  He stated
that Mounce had a maximum ability to lift and carry, on an
occasional basis, less than 10 pounds.  He further stated that
Mounce needed the opportunity to shift his position at will and
to take unscheduled breaks.  He determined that Mounce was able
to sit and work for 20 minutes at a time, stand for 20 and walk

for 10.  In an 8-hour day, he could sit for a total of 4 hours, stand for a total of 2, and walk for less than 1.  His maximum combined ability to sit, stand, and walk in an 8-hour day was 4 hours.  Scala felt that Mounce would need to take steps to rest to relieve pain or take breaks for 10 minutes after 20 minutes of activity.  In an 8-hour day, Scala found Mounce capable of reaching in any direction and pushing and pulling for less than 2 hours, handling for about 2 hours, and using his hands to feel or finger for about four hours.  He found that Mounce was able to climb stairs and ramps for less than 2 hours and unable to climb ladders, balance, stoop, crouch, kneel, or crawl.  Scala noted that Mounce's pain and disability would increase with excessive bending, lifting, twisting, or prolonged sitting, standing, or walking.  He opined that Mounce's limitations had been present since December 2003 and would cause him to be absent from work more than 3 times a month.

On October 23, 2008, Dr. Nagel gave Mounce a cervical epidural corticosteroid injection to treat his neck pain. Mounce returned on November 20, 2008, stating that the first injection had resulted in some slight improvement.  He returned

12

again on December 18, 2008 for a third epidural, but noted that the first two had not caused substantial improvement.

On November 25, 2008, Mounce saw Darlene Gustavson, Psy.D., for a disability evaluation.  She did not observe any gait or posture abnormalities, and stated that he ambulated independently.  Mounce's fine and gross motor skills appeared to be intact, and the doctor noted that he was able to participate in a sixty-minute interview without pain complaints.  She observed his mood as being calm with mild irritation.  Mounce's language comprehension appeared intact, his affect was appropriate, he laughed and smiled at appropriate times during the interview, his thought processes were logical and directed, his thought content was normal, there was no evidence of psychosis, he denied current suicidal ideation, his judgment and insight were intact, and his intellectual functioning was estimated in the average range.  He achieved a score of 27/30 on his Mini-Mental Status Examination.

Dr. Gustavson described Mounce's social life as active.  A typical day involved waking up around 9:00 a.m., having coffee, napping, watching TV, letting the dog in and out, reading emails, searching the internet, visiting family, driving his

13

wife places, and going to bed at 10:00 p.m.  He took his medication and attended appointments.  He seldom completed household chores or cooked.  His sleep was disrupted by pain and possibly sleep apnea.  Dr. Gustavson diagnosed Mounce with chronic adjustment disorder with depressed mood.  She also made a diagnosis of chronic pain.  She recommended that he begin mental health treatment.

On January 12, 2009, Mounce saw Dr. Levy and complained of issues with his neck, "as well as everywhere else."  The doctor conducted a nonfocal examination, and had nothing to offer other than the suggestion that Mounce get a primary care provider to prescribe medication.

On February 10, 2009, Mounce saw Dr. Moran for a follow-up regarding his right knee.  Although Mounce's left knee had recovered well from microfracture surgery, he was experiencing increased pain in his right knee.  Dr. Moran felt that Mounce was going through a difficult time and could not have surgery, and so he injected the knee with a combination of Lidocaine, Marcaine, and Depo-Medrol.

Mounce returned to Dr. Moran on April 28, 2009, complaining that he continued to have pain in the medial aspect of his right

14

knee.  An X-ray showed a considerable amount of degenerative disease in the medial compartment of both knees, with the right knee worse than the left, and some spurring in the medial compartment.  He concluded that Mounce was in a "tough spot," being only 49 years old, yet afflicted with arthritis in both knees, varus knees, and meniscal pathology.  He noted that an arthroscopy of the right knee would be helpful, but only to a degree.  He advised Mounce to lose weight, take Aleve, and avoid squatting and kneeling.  He gave Mounce another knee injection.

On May 4, 2009, Mounce consulted with Dr. Lundy of the Dartmouth-Hitchcock Clinic for complaints of male hypogonadism, degenerative changes in his knees, and his weight.  Dr. Lundy recommended a test of Mounce's testosterone level.

On June 26, 2009, Mounce returned to Concord Orthopaedics for a repeat cortisone injection for his right knee.  The preceding 24 to 48 hours had been quite painful for him, and ice and anti-inflammatories provided only minimal relief.  Physical examination revealed significant tenderness throughout the entire right knee.  Ms. Joe's impression was right knee degenerative joint disease, and she administered an injection.

15

She advised Mounce to continue using ice and anti-inflammatories and to increase activities as he felt comfortable.

Mounce saw Dr. Lundy for a physical on September 2, 2009. The doctor noted that Mounce claimed he was very lethargic and unable to exercise as a result of his cervical and knee complaints.  Dr. Lundy diagnosed him with morbid obesity, degenerative disk disease of the spine and osteoarthritis of the knees, pre-diabetes/impaired glucose tolerance, and male hypogonadism.

On September 24, 2009, both of Mounce's knees were X-rayed. His left knee showed advanced degenerative arthritis and his right showed advanced osteoarthritis.  Degenerative changes of the left knee appeared more substantial than the right knee. Dr. Gonzalez reviewed the X-rays on October 21, 2009, injected both knees, and assessed Mounce as suffering from bilateral knee arthritis.  The doctor recommended maximizing non-operable therapy for as long as possible, given Mounce's morbid obesity and age.  He advised Mounce to reduce his weight to a BMI of less than 40, discussed options at the Clinic's bariatric program, and made arrangements for further Synvisc injections.

Mounce again met with Dr. Lundy on December 22, 2009, and complained of his neck pain and requested referral to a spine specialist. Dr. Lundy referred Mounce for a cervical MRI.

On April 12, 2010, Mounce again consulted Dr. Lundy for his neck pain and weight issues. Dr. Lundy noted that Mounce was concerned about being overweight and wanted a referral for bariatric surgery, but that "[a]side from this, he seems to be feeling well." In his assessment, Dr. Lundy wrote that Mounce had cervical degenerative disk disease and was overweight. He provided Mounce with a referral for a bariatric evaluation.

On May 11, 2010, Mounce had additional injections for his knees, as recommended by Dr. Gonzales.

On May 18, 2010, Dr. Lundy responded to an inquiry from Mounce's attorney, Elizabeth Jones. He explained that he had not formally evaluated Mounce on his ability to perform the work-related activities listed on the medical source statement. He further stated that, assuming there had been no change in Mounce's status since the FCE and PA Scala's 2008 evaluation, he deferred entirely to those evaluations. In reviewing the record, he opined that Mounce's overall clinical status had not

17

improved since the FCE and 2008 evaluation, and that most likely his ability to do work had not improved.

**D.   Administrative History**

In a function report dated August 15, 2008, Mounce described his daily routine.  He stated that he wakes up at about 8:00 and goes to his recliner where he has coffee and breakfast while watching television.  He showers, dresses, lets the dog in and out, and relaxes in the recliner with his laptop, reading news and emails until he dozes off to sleep for one hour.  When he awakes, he continues what he was doing, tends to the dog, eats lunch in the recliner, and watches television until he dozes off again.  He then takes a walk in the garden for 20 minutes and at 2:00 p.m., often for about two hours, he goes for a drive to see a friend, or goes shopping with his wife, or goes to an appointment.  When he returns, he has dinner in the recliner, checks emails, watches television, and dozes off to sleep.  He goes to bed at 10:00 p.m.

In his function report, Mounce responded to a number of questions pertaining to his ability to engage in normal tasks. He stated that his knee, neck, and shoulder pains wake him up at night and he has difficulty falling back to sleep.  He is unable

to do any household chores or yard work, though he can drive a
car on a daily basis, and once a week he spends an hour shopping
with his wife, where he needs a cart on which he can lean.  His
social activities consist of talking, reading the newspaper,
watching television, drinking coffee, and several times a week
he drives somewhere for an hour or two.  He does not have a
social life because his friends continue to engage in activities
that he is unable to perform.

Describing his injuries and conditions in quantitative
terms in the report, Mounce stated that he cannot lift more than
5 pounds, cannot squat, kneel, or stand for very long, cannot
reach or walk for more than 15 minutes or sit for more than 20
minutes.  Bending hurts, and he can walk for 10 minutes so long
as he is able to rest for 10 minutes and is later able to have
an afternoon nap.

On October 29, 2008, Dr. Matt Masewic, a non-examining,
non-treating medical consultant for the Disability Determination
Service, prepared a Physical Residual Functional Capacity
Assessment.  He opined that Mounce was able to do the following:
occasionally lift 20 pounds; frequently lift 10 pounds; stand
and/or walk 3 hours in an 8-hour day; sit for about 6 hours;

push and pull on an unlimited basis; occasionally engage in all postures; and perform all manipulations on an unlimited basis, with the exception of reaching overhead, which he could perform occasionally.

Dr. Masewic also described Mounce's ailments.  He wrote that Mounce has moderately severe degenerative joint disease of the knees, which, in conjunction with his morbid obesity, significantly affects his functional capacity in the area of ambulation.  He also wrote that Mounce has degenerative disk disease of the cervical spine with residual pain from a fusion that, in conjunction with bilateral impingement syndromes and weak rotator cuffs, significantly affects his functional capacity.  Dr. Masewic further noted that Mounce's Activities of Daily Living form was not complete, but indicated that he was able to prepare light meals, provide self-care, use a laptop, drive, shop, and walk for 10 minutes without a break.  He concluded that although Mounce's functional capacity was indefinitely affected by his conditions, Mounce did not have a listing level impairment.

**E.   Administrative Proceedings**

On June 21, 2010, a hearing was held before ALJ Thomas
Merrill.  Mounce testified that he had been suffering from
serious neck, bilateral shoulder, and bilateral knee pain, as
well as fatigue caused by his pain.  He stated that after his
knee injury in 2004, a combination of all his injuries caused
him to be unable to work any longer.  Mounce's wife testified as
well, stating that she and her husband did not presently have
health insurance, but did have it sporadically.  She explained
that where there were gaps in Mounce's treatment, it was because
they had no insurance.  During the times that they had health
insurance, she testified that Mounce would obtain treatment.

The ALJ denied Mounce's claims for DIB and SSI benefits on
July 6, 2010.  He found that Mounce had a number of severe
impairments -- degenerative joint disease in his knees;
degenerative disk disease in his cervical spine; bilateral
shoulder pain; and obesity -- but did not have a listing level
impairment.  The ALJ determined that Mounce had the RFC to
perform light work, with certain limitations, on a full-time
basis.

In arriving at his RFC determination, the ALJ evaluated the
credibility of Mounce's assertions of pain and its limiting

effects, and the opinion evidence of Mounce's medical providers.
The ALJ found that Mounce's assertions of pain were not credible
to the extent that they conflicted with the RFC.  In explaining
his finding, the ALJ focused on Mounce's lack of complaints over
long periods of time.  In addressing the opinion evidence, the
ALJ relied on the opinion of the agency physician, as supported
by Mounce's actual performance on the FCE conducted by Ms.
Heath.  He discounted Ms. Heath's view that Mounce could work
only part-time, gave little weight to the opinion of Mr. Scala,
and gave no independent weight to the opinion of Dr. Lundy,
whose opinion had deferred to the findings of Ms. Heath and Mr.
Scala.

Based on his determination of Mounce's RFC, the ALJ
determined that Mounce was able to perform his past relevant
work as an insurance adjuster, and was not disabled.  The
Decision Review Board affirmed the ALJ's decision on October 7,
2010.

## II.   **STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), I am authorized to review the
pleadings submitted by the parties and the administrative record

22

and enter a judgment affirming, modifying, or reversing the
"final decision" of the Commissioner.  My review "is limited to
determining whether the ALJ used the proper legal standards and
found facts [based] upon the proper quantum of evidence." Ward
v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

The findings of fact made by the ALJ are accorded deference
so long as they are supported by substantial evidence.  Id.
Substantial evidence to support factual findings exists "'if a
reasonable mind, reviewing the evidence in the record as a
whole, could accept it as adequate to support his conclusion.'"
Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769
(1st Cir. 1991) (per curiam) (quoting Rodriquez v. Sec'y of
Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If
the substantial evidence standard is met, factual findings are
conclusive even if the record "arguably could support a
different conclusion."  Id. at 770.  Findings are not
conclusive, however, if they are derived by "ignoring evidence,
misapplying the law, or judging matters entrusted to experts."
Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

The ALJ is responsible for determining issues of
credibility and for drawing inferences from evidence on the

23

record.  Ortiz, 955 F.2d at 769.  It is the role of the ALJ, not the court, to resolve conflicts in the evidence.  Id.

The ALJ follows a five-step sequential analysis for determining whether an applicant is disabled.  20 C.F.R. §§ 404.1520, 416.920.  The applicant bears the burden, through the first four steps, of proving that her impairments preclude her from working.  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  At the fifth step, the Commissioner determines whether work that the claimant can do, despite her impairments, exists in significant numbers in the national economy and must produce substantial evidence to support that finding.  Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

### III.  ANALYSIS

Mounce contends that the ALJ erroneously found his claims of disabling pain not to be credible.  Symptoms such as pain can "sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone."  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); see SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).  An individual's statements about his symptoms of pain, however, are insufficient by themselves to

24

establish that an individual is disabled.  SSR 96-7p, 1996 WL

374186, at *2.  In evaluating symptoms such as pain, the ALJ

must engage in a two-step analysis.  Id.  First, he must

consider whether the claimant is suffering from "an underlying

medically determinable physical or mental impairment . . . that

could reasonably be expected to produce the individual's pain or

other symptoms."  Id.  If the claimant meets that threshold, the

ALJ moves to the second step:

> the adjudicator must evaluate the intensity,
> persistence, and limiting effects of the
> individual's symptoms to determine the
> extent to which the symptoms limit the
> individual's ability to do basic work
> activities.  For this purpose, whenever the
> individual's statements about the intensity,
> persistence, or functionally limiting
> effects of pain or other symptoms are not
> substantiated by objective medical evidence,
> the adjudicator must make a finding on the
> credibility of the individual's statements
> based on a consideration of the entire case
> record.

Id.

At the first step, the ALJ found that Mounce's medically

determinable impairments could reasonably be expected to cause

the symptoms alleged by Mounce.  Tr. at 12.  That finding is not

challenged.  At the second step, the ALJ found that Mounce's

"statements concerning the intensity, persistence and limiting

effects of these symptoms are not credible to the extent they
are inconsistent with the [] residual functional capacity
assessment." Id. Mounce argues that the ALJ ignored and
misinterpreted evidence in reaching his credibility
determination.  I agree.

First, the ALJ found significant that in March 2004, Dr.
Moran noted that Mounce was "doing spectacularly well" after his
right knee surgery.  Id.  The record reveals, however, that Dr.
Moran told Mounce that he could not even walk for exercise, and
he noted that Mounce had significant, incurable arthritis in his
knee.  Tr. at 274.  The ALJ lifted the "spectacularly well"
language from Dr. Moran's notes without a consideration of the
context of those remarks.

The second error, of a much larger magnitude, was the
manner in which the ALJ addressed the lack of complaints by
Mounce about his knees, which he found indicative of the non-
severe nature of Mounce's pain.  Although the ALJ did not
explain with specificity how he used the evidence he cited to
reach his conclusion, approximately half of his discussion of
Mounce's credibility on the knee pain issue concerned his lack
of complaints.  See Tr. at 12-13.  The ALJ focused in particular

on his finding of two long gaps during which Mounce did not speak to medical providers about his knees.  The lengthy gaps are not supported by substantial evidence, however, and the ALJ ignored the explanation for why shorter gaps might exist.

The ALJ found a nearly four-year gap -- from May 2004 until February 21, 2008 -- during which Mounce did not even "mention" knee pain.  Tr. at 12.  In the midst of that period, however, Dr. Marino administered a course of treatment and injections for Mounce's knee pain.  Mounce failed to timely include in the record copies of Dr. Marino's treatment notes from April and May 2005, and thus they were unavailable for the ALJ's consideration and cannot be the basis for a reversal.  See Mills v. Apfel, 244 F.3d 1, 5-6 (1st Cir. 2001).[3]  Nonetheless, the record reviewed by the ALJ included numerous mentions that Mounce had complained of knee pain and received treatment from Dr. Marino predating February 2008.  For example, Dr. Marino's February 21, 2008 notes state that Mounce had shown improvement after knee injections a year or two prior, and Mr. Scala's June 25, 2008 notes state that Mounce saw Dr. Marino for treatment of his chronic knee pain in 2005.  Insofar as the ALJ relied on the

---

[3] Mounce does not allege good cause for the delay.

understanding that Mounce did not even mention his knee pain for four years, his conclusion is belied by facts in the record and unsupported by substantial evidence.

In regard to this four-year gap, the ALJ buttressed his reasoning by noting a series of medical examinations between 2004 and 2008 during which Mounce did not mention his knee pain. Tr. at 12.  Although the lack of complaints at these examinations is probative to a degree, especially the December 14, 2004 examination where Mounce did not note any past medical history or medications, the ALJ omitted from his discussion the fact that all the examinations were for specific, acute problems.  Mounce visited the emergency room three times, for a skin rash, for a swollen tongue, and for strep throat.  The only other examination prior to February 21, 2008, was a 2007 visit to the Dartmouth-Hitchcock Clinic when he underwent a colonoscopy and had polyps removed.  At these types of visits, one would not expect a patient to complain of unrelated aches and pains.

The ALJ next addressed a second gap, finding that after his February 21, 2008 mention of pain, Mounce did not complain of knee pain again until September 2008.  The record directly

28

contradicts the ALJ's finding.  Mounce mentioned his chronic
arithritis and knee pain, as well as his ongoing Synvisc
injections, on February 26.  Again on March 4, Mounce discussed
his knee pain, and Mr. Schwieger made a note that Mounce would
be having Synvisc injections in both knees in each next three
weeks.  Mounce received knee injections on March 6, 14, and 21.
A few months later, on June 25, 2008, Mounce told Mr. Scala that
despite those Synvisc injections and subsequent Euflexxa
injections, he was continuing to have problems with his knees.
The finding that Mounce did not complain of knee pain for
approximately 7 months following February 21, 2008 is
unsupported by substantial evidence.

In addition to contesting the factual basis for both gaps
found by the ALJ, Mounce contends that any remaining, shorter
periods wherein he did not complain of, or receive treatment
for, knee pain are due to his lack of insurance.  At the
administrative hearing, his wife testified that she and Mounce
were only sporadically insured.  She explained that while they
were uninsured Mounce could get some free treatment from
Dartmouth-Hitchcock, but he could not get all the treatment he
needed.  Before drawing "any inferences about an individual's

symptoms and their functional effects from a failure to seek or
pursue regular medical treatment," an ALJ must "consider[] any
explanations that the individual may provide." SSR 96-7p, 1996
WL 374186, at *7.  One such explanation is that "[t]he
individual may be unable to afford treatment."  Id. at *8.
Although the ALJ was entitled to find that a lack of insurance
was insufficient to explain the dearth of complaints, the
opinion does not reveal that he even considered the explanation.[4]

     Because the ALJ ignored and misrepresented record evidence,
his credibility findings are not based on substantial evidence.
Had the ALJ found that Mounce's knee pain precluded him from
working on more than a part-time basis, there would be no work
available for Mounce, according to a hypothetical asked of the
testifying vocational expert.  Because the ALJ's reliance on
erroneous information may therefore have prejudiced Mounce's
claim, the case must be remanded for further proceedings.  In
light of this result, I need not consider Mounce's additional
arguments pertaining to the ALJ's evaluation of opinion evidence

---

[4] The ALJ did note that Mounce declined physical therapy for his
neck and shoulders because he was waiting for Workers'
Compensation to cover the cost.  The ALJ does not mention,
however, financial difficulties or a lack of insurance at any
other point in his recitation of fact or his analysis.

from medical sources, the ALJ's credibility determination of Mounce's complaints of neck pain, and the ALJ's alleged failure to base his RFC on substantial evidence.

### IV.  **CONCLUSION**

For the foregoing reasons, I grant Mounce's motion to reverse (Doc. No. 7), deny the Commissioner's motion to affirm (Doc. No. 9), and pursuant to 42 U.S.C. § 405(g), remand this case to the Social Security Administration.  The clerk is directed to enter judgment accordingly.

SO ORDERED.


/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

November 2, 2011

cc:  Elizabeth R. Jones, Esq.
     T. David Plourde, Esq.